Robert S. Westermann (VSB No. 43294)
Kristen E. Burgers (VSB No. 67997)
Brittany Falabella (VSB No. 80131)
HIRSCHLER FLEISCHER, P.C.
The Edgeworth Building
2100 East Cary Street
Post Office Box 500
Richmond, Virginia 23218-0500
Telephone: 804.771.9500
Facsimile: 804.644.0957
E-mail:          rwestermann@hirschlerlaw.com
                kburgers@hirschlerlaw.com
                bfalabella@hirschlerlaw.com

*Counsel for W. Stephen Scott, Chapter 7 Trustee*
*for the Bankruptcy Estate of Service Dogs by Warren Retrievers, Inc.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Lynchburg Division

| | |
|---|---|
| In re:<br><br>**SERVICE DOGS BY WARREN RETRIEVERS, INC.,**<br><br>　　Debtor. | **Case No. 20-60860-RBC**<br>**Chapter 7** |
| **W. STEPHEN SCOTT, CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATE OF SERVICE DOGS BY WARREN RETRIEVERS, INC.,**<br><br>　　Plaintiff,<br><br>v.<br><br>**CHARLES D. WARREN, JR., BORDEAUX FARMS, LLC, AND CHARITABLE OCCASION, LLC,**<br><br>　　Defendants. | **Adversary Proceeding No. _____** |

## <u>COMPLAINT</u>

W. Stephen Scott, the Chapter 7 Trustee (the "**Trustee**") for the bankruptcy estate (the "**Estate**") of Service Dogs by Warren Retrievers, Inc. (the "**Debtor**"), by counsel, files this Complaint (the "**Complaint**") against Charles D. Warren, Jr. ("**Warren**"), Bordeaux Farms, LLC ("**Bordeaux Farms**"), and Charitable Occasion, LLC ("**Charitable Occasion**" and,

together with Bordeaux Farms, the "**Related Entity Defendants**").   Warren and the Related

Entity Defendants are hereinafter referred to collectively as the "**Defendants.**"   In support of the

Complaint, the Trustee respectfully states as follows:

## NATURE OF THE ACTION

1.      The Trustee seeks entry of a judgment (a) finding that (*i*) Warren is the alter ego

of the Debtor and that Warren is the alter ego of the Related Entity Defendants or, (*ii*) in the

alternative, (b) substantively consolidating the Related Entity Defendants with the Debtor; (b)

declaring (*y*) the BF Property (as defined below) is property of the bankruptcy estate or, (*z*) in the

alternative, Bordeaux Farms is a constructive Trust and avoiding and recovering the transfer of

the BF Property by Warren to Bordeaux Farms as a fraudulent transfer to a trust pursuant to

sections 548 and 550 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the

"**Bankruptcy Code**"); (c) enjoining Warren and Bordeaux Farms from selling the BF Property

or, in the alternative, requiring Warren and Bordeaux Farms to escrow all net sale proceeds

pending resolution of the matters set forth herein; and (d) enjoining Warren and Charitable

Occasion from selling the CO Property or, in the alternative, requiring Warren and Charitable

Occasion to escrow all net sale proceeds pending resolution of the matters set forth herein.

## STATEMENT OF THE CASE

2.      For many years, Warren bred Labrador retrievers for family pets and companion

animals.  Without the requisite background or training, Warren decided that he was qualified to

sell his Labrador retriever puppies as trained service dogs, able to detect and alert to low blood

sugar in persons with diabetes, quell anxiety and outbursts in people with autism, and calm and

soothe people with post-traumatic stress disorder.

3.      Trained service dogs are expensive, and Warren embarked upon a scheme to

make the dogs more affordable to middle-class families.  Initially, Warren sold puppies to people for relatively modest sums, but then forced them to sign multi-year "training" contracts, often with a value of $20,000 or more, upon delivery of the puppy.  If the purchaser refused to sign the contract, Warren would take the puppy back.

4.      After receiving negative publicity for this practice (most notably on a 2016 episode of the Dr. Phil television show[1]), Warren offered monetary "grants" to families and encouraged them to raise funds from friends, family, and employers through the Debtor, which is a not-for-profit entity.   By allowing people to "crowdfund" through the Debtor, Warren controlled the cash.  He then delivered dogs on his timetable, and the dogs had varying degrees of skills and reliability.  Upon information and belief, Warren did not offer refunds on his service dogs.

5.      The typical cost of a service dog was $25,000, with some portion of that amount being funded by a "grant" purportedly from generous donors who supported the Debtor's mission.  For that handsome price, purchasers often got cute puppies who barely had house manners, let alone advanced service dog skills.

6.      The Debtor was very successful at attracting individuals and families who saw its service dog program as a way to restore normalcy and predictability to their lives and to protect their loved ones.  According to the Statement of Financial Affairs ("SOFA") [Docket No. 19] filed in the Bankruptcy Case, the Debtor generated gross revenue from operations of $1.3 million in 2018 and $980,000 in 2019.

7.      Based on the information currently available to the Trustee, Warren used this money to fund his lavish lifestyle.  Warren received compensation from the Debtor in excess of

---

[1] https://www.drphil.com/videos/women-claim-they-were-scammed-by-a-service-dog-company-that-promised-their-dogs-could-save-lives/.

$175,000 per year, and most, if not all, of his expenses were paid by the Debtor.  The Debtor paid for the upkeep, maintenance, and improvements on the BF Property (as defined below), his 150+ acre farm in Madison County, which is owned by Bordeaux Farms and from which he and his spouse, Jacob Dudek-Warren ("**Dudek**") operated Bordeaux Livestock, LLC ("**Bordeaux Livestock**"), an organic livestock and farming business. Warren used money from the Debtor to make permanent improvements to the BF Property, including but not limited to significant renovations to the house and other living quarters and the construction and fit-out of horse stables, and dog kennels, and numerous outbuildings and storage sheds.  He purchased multiple trucks and custom made trailers, as well as a luxury motorhome all allegedly for the Debtor's business but which were also used by Warren and Dudek for personal travel and vacations.  By using the donations given to the Debtor by families for his own benefit, Warren was able to enjoy a very comfortable lifestyle.  He and Dudek lived rent free in the residence on the BF Property, which is valued at $1.5 million.  They took extravagant vacations, often travelling in the luxury motorhome, and neither one held a job outside of the Debtor.

8.      Eventually, Warren's scheme began to unravel.  He received national negative publicity based on his business practices as early as 2016.  Despite the negative publicity, he did not change his business practices.  Instead, he continued to sell dogs at a very aggressive rate. He sold more dogs than he could possibly deliver, and he could not refund the money raised by purchasers because he had already spent it. In May 2018, the Attorney General for the Commonwealth of Virginia filed a complaint against the Debtor and Warren, alleging violations of the Virginia Consumer Protection Act and the Virginia Solicitation of Contributions law.  In the months prior to the bankruptcy filing, Warren transferred all the Debtor's valuable assets, including vehicles and trailers, to former employees and other "friendly" parties.  Warren also

liquidated the Debtor's breeding stock and dogs in training at a roadside "bonding event" held two months prior to the Petition Date (as defined below).  Eventually, Warren shut down the Debtor's business operations, after selling or transferring substantially all of  its assets and leaving it with total assets of $73.58, consisting only of cash on hand.  *See* Schedule A/B [Docket No. 19].

9.      The Debtor listed 180 unexpired service dog contracts on its Schedule G [Docket No. 19].  Some, if not all, of those contracts are with families who never received a dog.  Of the 116 claims filed in the Bankruptcy Case, the vast majority, in both number and dollar amount, were filed by individuals who had service dog contracts with the Debtor.  These claims comprise approximately $1.8 million of the total general unsecured claims pool of $2.21 million. These families, who all raised funds towards the purchase of a puppy, are left empty-handed and broken-hearted, while Warren and Dudek have the BF Property now under contract for sale with a listing price of $1.5 million and are, upon information and belief, looking for a new farm in Florida.

10.     Among other allegations in this Complaint, Warren engaged in a pervasive and longstanding scheme to defraud puppy purchasers and divert the money to his wholly-owned entities, Bordeaux Farms, Charitable Occasions, and Bordeaux Livestock.  Warren did not observe corporate formalities, and he used the Debtor's operating revenues as a slush fund to support his lifestyle.  Warren controlled the Related Entity Defendants and, for all intents and purposes, is the public face and private mastermind of the Debtor and the Related Entity Defendants.  If Warren is allowed to sell the BF Property and retain the sale proceeds, he will deny the creditors in this Bankruptcy Case, holding general unsecured claims of over $1 million, any meaningful recovery, even though the creditors unwittingly financially supported and

significantly improved the BF Property through their donations to the Debtor.

## JURISDICTION AND VENUE

11.    On May 29, 2020 (the "**Petition Date**"), the Debtor filed with the United States Bankruptcy Court for the Western District of Virginia, Lynchburg Division (the "**Court**") a voluntary petition for relief pursuant to Chapter 7 of the Bankruptcy Code, thereby commencing the Bankruptcy Case.

12.    This action is brought pursuant to Rule 7001 *et seq.* of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") to seek relief in accordance with 11 U.S.C. §§ 105, 547, 548, 550, and 551 and other applicable law.

13.    This adversary proceeding (the "**Adversary Proceeding**") arises out of and relates to the Debtor's Bankruptcy Case.

14.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter constitutes a "core" proceeding within the meaning of 28 U.S.C. §§ 157(b)(1) and 157(b)(2)(A), (B), (F), (K), and (O).

15.    The Trustee consents to entry of final orders and judgments by the Court in this Adversary Proceeding.

16.    Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a), as this Adversary Proceeding arises under or relates to a case under Title 7 of the Bankruptcy Code which is pending in this District.

## PARTIES

17.    The Trustee was appointed on May 29, 2020.

18.    The Debtor was a Virginia nonstock not-for-profit corporation in the business of raising, training, and placing purported service dogs with individuals with certain diseases or

disorders, such as diabetes, autism, post-traumatic stress disorder, and seizure disorders.

19.     Warren was the founder, President, and Chairman of the Board of Directors of the Debtor.  His principal address is 1543 Beahm Town Road, Culpeper, Virginia 22701.  Warren is an insider ("**Insider**") of the Debtor, as such term is defined in section 101(31) of the Bankruptcy Code.

20.     Bordeaux Farms is a single-member Virginia limited liability company owned by Warren which leased office and kennel facilities to the Debtor for its business operations.  Its principal address is 1543 Beahm Town Road, Culpeper, Virginia 22701.  Upon information and belief, Bordeaux Farms is a constructive trust established solely for the benefit of Warren.

21.     Charitable Occasion is a single-member Virginia limited liability company owned by Warren which owns property adjacent to the property owned by Bordeaux Farms.  Its principal address is 1543 Beahm Town Road, Culpeper, Virginia 22701.

## BACKGROUND

22.     The Debtor was in the business of raising, training, and placing purported service dogs with individuals with certain diseases or disorders, such as diabetes, autism, post-traumatic stress disorder, and seizure disorders.  On its website, the Debtor characterized these conditions as "invisible disabilities", which its service dogs were trained to detect and to alert either the individual or family members of an imminent acute condition.

## A.     Formation and Early Years

23.     Upon information and belief, Warren, the Debtor's founder, President, and Chairman of the Board of Directors, has been a breeder of Labrador retrievers in central Virginia for over fifteen years.  In December, 2003, he formed Warren Enterprises, LLC, which is listed

on Manta as a dog breeder in Montpelier, Virginia.[2]  In January 2008, Warren formed Somerset Labradors, LLC.  Upon information and belief, Somerset Labradors bred and sold Labrador retriever puppies as family pets, companions, and hunting dogs.

24.     On October 15, 2010, Warren formed the Debtor as a Virginia nonstock, not-for-profit corporation with the name Guardian Angels Service Dogs, Inc.  Thereafter, the Debtor obtained its status as a tax-exempt charitable organization under  section 501(c)(3) of the Internal Revenue Service (IRS) Tax Code.  On April 6, 2011, the Debtor filed its initial Registration Statement for a charitable organization with the VA Dept. of Agriculture and Consumer Services.  Upon information and belief, Warren had no prior history training service dogs.

25.     As a nonstock corporation, the Debtor has no members or shareholders.  Nonstock corporations are instead controlled and managed by their directors and officers.  In the Debtor's Bylaws, Warren ensured that he would retain managerial and financial control of the Debtor.  Section 4.5 of the Bylaws prohibits Warren's removal as a Director other than by a unanimous vote of all the other directors and only "on the basis of a material and intentional breach of fiduciary duty or a willful wrongful action."  Additionally, section 9.3 provides that Warren shall serve as the Debtor's president and shall be removed as President only by a unanimous vote of all the other directors and only "on the basis of a material and intentional breach of fiduciary duty or a willful wrongful action."  A true and correct copy of the Debtor's Bylaws is attached hereto as Exhibit A.  The authority and control granted to Warren in perpetuity under the Debtor's Bylaws clearly renders Warren as a person in control ("**PIC**") of the Debtor.

26.     On September 19, 2012, the Debtor filed an amendment to its corporate charter with the Virginia State Corporation Commission changing its name from Guardian Angels Service

---

[2] https://www.manta.com/c/mtmzhv1/warren-enterprises-llc#about.

Dogs, Inc., to Service Dogs by Warren Retrievers, Inc.

**B.      The Related Entity Defendants**

27.      On February 4, 2011, Warren formed Bordeaux Farms, for the express purpose of holding title to any property that Warren purchased. By holding title to property through Bordeaux Farms, rather than as an individual or as the Debtor, Warren sought to keep such property beyond the reach of his and the Debtor's creditors and essentially hold it in a constructive trust for his benefit.

28.      On October 31, 2011, prior to the closing on the purchase of the BF Property, the Debtor, as tenant[3], and Bordeaux Farms, as landlord[4], entered into a Commercial Lease Agreement (the "**SDWR Lease**") for the lease of office and kennel space located at 1543 Beahm Town Road, Culpeper, Virginia, and commonly known as "Bordeaux Farms" (the "**BF Property**"). The lease term was a periodic tenancy commencing on October 31, 2011, and continuing on a year-to-year basis. The base rent was $3,600 per month, plus fees and taxes arising from the Debtor's business. The SDWR Lease was signed by Warren on behalf of Bordeaux Farms and by Dudek on behalf of the Debtor.

29.      On November 4, 2011, Warren purchased the BF Property from Aurora Loan Services, LLC for $650,000. The deed evidencing the transfer of the BF Property to Warren was recorded in the land records of Madison County (the "**Land Records**") on November 7, 2011, as Instrument No. 110001530. Contemporaneously with the purchase, Warren transferred the BF Property to Bordeaux Farms by Deed of Contribution, which was dated on November 4, 2011, and

---

[3] The Lease was executed by Service Dogs by Warren Retrievers, Inc., as tenant, even though the Debtor would not officially change its name from Guardian Angels Service Dogs, Inc. to Service Dogs by Warren Retrievers, Inc. until September 2012.

[4] The Lease was executed by Bordeaux Farms, even though the Property had not yet been purchased by Warren or transferred to Bordeaux Farms on the date of the Lease execution. The Property was purchased by Warren and contemporaneously transferred to Bordeaux Farms on November 7, 2011.

recorded among the Land Records on November 7, 2011, as Instrument No. 110001531.  By transferring the BF Property to Bordeaux Farms, Warren sought to keep the BF Property beyond the reach of his or the Debtor's creditors and to use Bordeaux Farms as a constructive trust for his benefit.

30.      Contemporaneously with the closing on the BF Property, a line of credit in the amount of $669,040.64 was obtained from Essex Bank (the "**Essex Bank Loan**").  To secure the Essex Bank Loan, Charles D. Warren, Sr., Marianne Warren, and Bordeaux Farms entered into (a) that certain Credit Line Deed of Trust (the "**Essex Deed of Trust**") for the benefit of Essex Bank, in the original maximum principal amount of $669,040.64, which was secured by the BF Property and recorded among the Land Records on November 7, 2011, as Instrument No. 110001532; and (b) that certain Assignment of Rents for the benefit of Essex Bank, which was recorded among the Land Records on November 7, 2011, as Instrument No. 110001533.  The SDWR Lease was subject to Essex Bank's security interest under the Assignment of Rents.

31.      The BF Property consists of a 158 acre farm located in Madison County, improved by a stone home built in 1876, plus various sheds and outbuildings.  Upon information and belief, during the time that the BF Property has been owned by Bordeaux Farms, the following permanent improvements were made:  an 11,050 square foot horse barn with a tax-assessed value of $276,250; three kennels of 455, 270, and 378 square feet, with an aggregate tax-assessed value of $8,824; one 600 square foot building with a tax-assessed value of $2,400; and thirteen sheds ranging in size from 168 to 2100 square feet, with an aggregate tax-assessed value of $26,770.[5]  At all times prior to the Petition Date, Warren and Dudek resided at the BF Property and ran the Debtor's business operations from the BF Property.

---

[5] All values and building sizes are taken from the on-line information available for the Property on Vamanet. http://www.vamanet.com/cgi-bin/OTHER?LOCAL=MAD&RECNUM=1068&DWELL=1.

32.     On May 3, 2012, Charitable Occasion was formed as a Virginia not-for-profit limited liability company.  Thereafter, Charitable Occasion obtained its status as a tax-exempt charitable organization under section 501(c)(3) of the IRS Tax Code.

33.     On May 31, 2012, Charitable Occasion purchased a parcel consisting of 74.770 acres (the "**CO Property**") adjacent to the BF Property from Charlotte A. Jackson for $156,536. The deed evidencing the transfer of the CO Property to Charitable Occasion was recorded in the Land Records on June 1, 2012, as Instrument No. 120000777.

34.     Upon information and belief, Warren controls and is the sole member of both Bordeaux Farms and Charitable Occasion.

35.     On November 27, 2012, Warren formed Bordeaux Livestock.  Bordeaux Livestock is also operated from the BF Property and CO Property and uses the horse stables and sheds and outbuildings for its business operations.  Upon information and belief, Bordeaux Livestock is operated and controlled by Warren and Dudek.

36.     According to a website dedicated to local farms, Bordeaux Farms "specialize[s] in naturally raising Beef, Pork and Eggs for our customers directly. We also have our own swarm of honey bees that produce local raw honey. Because our property includes nearly 240 acres of gently rolling hills, wooded trails, lush green pastures, streams, springs and approximately 1 1/2 miles of river frontage, we have the space required to raise healthy animals and superior local products."[6]

37.     Another website dedicated to Virginia equestrian facilities and services includes a directory page for Bordeaux Farms, which states:

> Bordeaux Farms, LLC was established for a training, boarding and breeding facility for the enhancement of equine. We want horses and people to accel [*sic.*] at their passion. Bordeaux Farms is in beautiful Madison County, between Culpeper and

---

[6] https://www.localharvest.org/bordeaux-farms-M70353.

Orange on the Robinson River.

This family owned facility includes 168 acres of gently rolling hills, wooded trails, lush green pastures, streams, springs and approximately [*sic.*] a mile of river frontage. The entire farm is fenced and crossed fenced. Our main stable features 18 stalls, while our other barns feature 27 miniature to draft sized stalls.

Amenties [*sic.*] include: Climate controlled lounge with cable t.v., 2 bathrooms (one with a shower), laundry, tackrooms, lockers, one hot/cold wash stall, 3 outdoor wash stalls for cooling down in the summer heat, lighted 100 x 200 riding arena with judges stand, smaller lighted riding ring and trails around the farm.

Bordeaux Farms is a full-service boarding and training facility for all disciplines. Where boarded horses are turned out daily in one of our 25 boarded paddocks.. [*sic.*][7]

**C.    The Spotts Fain Dispute and the Related Entity Chapter 11 Filings**

38.    On December 20, 2013, Spotts Fain, P.C. ("**SF**") filed a verified complaint against Warren, Bordeaux Farms, and Charitable Occasion in the Circuit Court for Madison County, Virginia, for fees due in connection for legal services.  While Warren, Bordeaux Farms, and Charitable Occasion disputed the validity of the debt on the grounds that the legal fees were provided primarily to the Debtor, Warren, Bordeaux Farms, and Charitable Occasion failed to file an answer.

39.    On September 17, 2014, SF obtained a default judgment against Warren, Bordeaux Farms, and Bordeaux Livestock in the amount of $209,680.98.

40.    On October 2, 2014, a Special Commissioner executed a Deed of Trust (the "**SF Deed of Trust**") on behalf of Bordeaux Farms and Charitable Occasion, which was recorded against the BF Property and the CO Property in the Land Records on October 2, 2014 as Instrument No. 140001217.

41.    On March 13, 2019, Bordeaux Farms and Charitable Occasion each filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court

---

[7] http://www.virginiaequestrian.com/main.cfm?action=greenpages&sub=view&ID=12241.

for the Western District of Virginia (Case Nos. 19-60607 and 19-60609, respectively).

42.     In the schedules and statements filed by each entity, SF was the only creditor identified, and Warren was identified as the sole member. Upon information and belief, and as evidenced by the Schedule A filed by Bordeaux Farms, the Essex Deed of Trust was presumably paid in full and released sometime after the SF Deed of Trust was recorded but before Bordeaux Farms filed its chapter 11 petition.

43.     Bordeaux Farms and Charitable Occasion reached a settlement agreement (the "**Settlement**") with SF, whereby Bordeaux Farms and Charitable Occasion agreed to pay SF the aggregate sum of $200,000, plus interest at the rate of 6% per annum and any collection costs and fees. This amount was to be paid in installments, with $100,000 due by December 23, 2019, and the remainder due in monthly payments of $3,042.19 per month commencing on January 23, 2020 and ending no later than December 23, 2022. *See* Exhibit A to Amended Plan of Reorganization for Small Business Under Chapter 11 (the "**BF Plan**") [Docket No. 28 in Case No. 19-60607].

44.     The Settlement was memorialized in the BF Plan, which was confirmed by order entered on October 29, 2019 [Docket No. 39, Case No. 19-60607]. Section III.D.1 of the Disclosure Statement for Small Business under Chapter 11 [Docket No. 22, Case No. 19-60607] states that the source of the funds for payments due under the BF Plan will be the $3,600 monthly rental payments due from the Debtor to Bordeaux Farms under the SDWR Lease.

45.     Upon information and belief, Bordeaux Farms, Charitable Occasion, and/or their designee made the initial settlement payment of $100,000 to SF. Commencing on December 23, 2019 and ending on April 21, 2020, SF received weekly payments from the Debtor in the amount of $800. The aggregate amount of payments received by SF during this time period was $12,800.

C.      **The Debtor's Business "Model"**

46.     On its website and Facebook pages, the Debtor promoted its mission to breed, train, and place high quality, well-skilled service dogs to people with "invisible disabilities" such as diabetes, autism, seizure disorder, and post-traumatic stress disorder ("**PTSD**").   While these disabilities are "invisible" to the human eye, the Debtor asserted that its trained service dogs could detect the disability, warn the owner/handler of an upcoming health episode (whether that be a drop in blood sugar levels, a seizure, or a panic attack), and help alleviate the situation by comforting its owner/handler.

*(1)     The Sale Strategy*

47.     Upon information and belief, when the Debtor first began offering service dogs in 2011, it told interested parties that its puppies cost $1,000.   After the purchaser had given the Debtor the "purchase price", one of the Debtor's employees (and often times Warren himself) would deliver a puppy to the purchaser.   At the time of delivery, the employee presented the purchaser with a multi-year service contract to train the dog.   The cost of the service contract was generally in excess of $20,000.   If the purchaser refused to sign the contract, the Debtor's employee would take the puppy back.   In those cases, the Debtor did not refund the purchase price to the purchaser.

48.     After this practice drew national negative publicity, including an episode of the popular television talk show Dr. Phil[8] in 2016, the Debtor changed its practices.   Instead of charging a low up-front purchase price with a high-cost, long-term service contract, the Debtor decided to charge a high up-front fee - generally $18,000 to $27,000, with an average fee of $25,000 (the "**Fee**") - for a trained service dog.   This Fee purportedly included not just the cost of the dog and initial orientation between the dog and the affected individual and his/her family, but also ongoing support and training for two years after placement.

---

[8] *See* Note 1.

*(2)*    *The Puppy Raisers*

49.    As part of the early training and socialization process, the Debtor would place its puppies with puppy raisers in the local area.  The puppy raisers were charged with teaching the puppies basic house manners, such as leash training and housebreaking; exposing the puppies to new situations that they would likely encounter as service dogs such as crowds, public places, and noise; and evaluating the puppy's temperament and trainability.  The Debtor did not pay the puppy raisers for their services but did agree to pay for the puppy's food (if the puppy raiser was in college) and veterinary care and to provide training and support while the puppy was with the puppy raiser.  The Debtor retained ownership of the puppy and required the puppy raiser to obtain prior authorization from the Debtor for all veterinary procedures.

50.    Upon information and belief, the Debtor often failed to uphold its end of the bargain with the puppy raisers.  It would not provide training or support or food, nor would it authorize medical treatment.  The puppy raisers, often college students, were on their own to figure out training issues and pay for veterinary care.  The puppies would sometimes stay with the puppy raisers for a year or more.

51.    When the Debtor needed a puppy to fulfill a service dog contract, it would take the puppy from the puppy raiser, with little or no notice, and without providing reimbursement of expenses to the puppy raiser.  Upon information and belief, some puppy raisers refused to relinquish their puppy to the Debtor because of the Debtor's lack of support of and failure to meet its financial obligations to the puppy raiser.

52.    Upon information and belief, when a puppy raiser refused to relinquish a puppy, the Debtor, through its attorney, would demand payment of $25,000, based on a clause in the contract which required payment of $25,000 if the dog was lost or injured.  If the puppy raiser refused to

pay $25,000 and did not return the puppy, the Debtor filed suit against the puppy raiser, sometimes claiming as much as $75,000 for a puppy.[9]

53.     In one lawsuit filed in the General District Court for Madison County, Virginia, the Debtor asserted a claim for $25,000 against a puppy raiser.  The puppy raiser, a college student, stated that the puppy had numerous health and behavioral problems.  The Debtor failed to provide any training and support for the behavioral problems, and failed to authorize necessary medical care.  The puppy raiser incurred over $5,000 in veterinary bills caring for the puppy, including the cost of cataract surgery.  While the puppy's medical conditions ruled it out as a service dog candidate, the Debtor nonetheless contended that its value was $25,000.  The judge ruled in favor of the puppy raiser.[10]

54.     Through the puppy raiser program, the Debtor attempted to have each dog's basic early training conducted by volunteers who would absorb the puppy's expenditures during that time period.  When the Debtor needed to provide a service dog to a Recipient (as defined below), it would simply reclaim the puppy on little or notice.  If the puppy raiser resisted, the Debtor, through its attorney, would file suit for $25,000 on behalf of the Debtor.  While some puppy raisers contested the Debtor's scheme, upon information and belief many simply relinquished the puppy without reimbursement for food or expenses because they did not want to incur legal fees and expenses fighting the Debtor and they could not afford the cost of a $25,000 puppy.

(3)     _Service Dog Fundraising and Placement_

55.     Because many individuals and families (each, a "**Recipient**") could not afford the $18,000 to $27,000 Fee, the Debtor offered assistance in raising funds to pay for its service dogs.

---

[9] https://roanoke.com/news/local/virginia-tech-student-service-dog-company-settle-puppy-lawsuit/article_d95cf271-68d3-5480-80a3-7e7fc33f3656.html.
[10] https://dailyprogress.com/community/madisonnews/news/judge-rules-in-favor-of-puppy-raiser/article_a975423a-8ebd-11e9-8ac6-6f5249b35ba7.html.

This assistance often came in the form of a "grant", which would be offered on the condition that the Recipient raise the balance of the funds.  Upon information and belief, the grant was never funded.  Rather, it was used as an incentive to entice the families to raise the balance of the Fee.

56.    The Recipients typically raised funds by requesting that friends and family make a donation to the Debtor, on the Recipient's behalf, and by requesting matching funds from employers.  For example, in the spring of 2020, just prior to the Petition Date, the Debtor offered a $7,500 grant to a family that wanted a service dog.  The family raised $17,500, the balance of Fee, through their own contributions, family members' contributions, and employer matching funds.

57.    Because the Debtor is a non-profit entity, the donations were tax–deductible, a benefit that the Debtor promoted widely.  What the Debtor did not tell donors, however, was that once a donation was made, it was non-refundable, even if a family could not meet its fundraising goals and was thus not eligible to receive a service dog.

58.    The Debtor represented that its dogs were thoroughly evaluated as puppies and selected for their temperament, scenting ability, and health, and thereafter underwent rigorous training to become qualified service dogs.  In reality, upon placement, the service dogs often had minimal training, even in basic house manners (other than what was provided by the untrained volunteer puppy raisers), and did not have the skill set to assist the Recipient with his or her mental and/or physical illnesses.

59.    The Debtor also placed service dogs that had behavioral or physical limitations which should have disqualified the dog from being a service animal.  When a Recipient complained that a dog was unsuitable, the Debtor would sometimes send a trainer to the Recipient's home to work on the behavioral or training issue.  More often, however, the Debtor

would ignore the complaint and refuse to provide support and/or substitute a more suitable dog. Upon information and belief, in at least a few instances, the Debtor knowingly placed a dog as a service animal which had been evaluated by the Debtor's employees as tempermentally unfit for placement.

60.     The Recipients and their families, many of whom were already financially challenged due to their pre-existing medical conditions, were looking forward to the arrival of their service dogs.  Based on the Debtor's representations, the families thought that the service dog would solve their problems and improve the quality of their lives, not create more problems and make their lives more difficult.

61.     As noted above, even when it was clear that a service dog was unfit for the job, the Debtor refused to refund the Recipient's money or substitute a more suitable dog. Additionally, the Recipients and their families often became attached to the service dog once it was placed in their home, no matter how unsuitable the dog was, and were often reluctant to send the dog back.  In many instances, the Recipients and their families, all of whom expected a trained service dog, ended up with nothing more than a cute, expensive puppy with little training and no way to get their money back.

**D.     Lawsuit filed by the Commonwealth of Virginia**

62.     As a result of these practices, on May 7, 2018, the Commonwealth of Virginia filed a complaint against the Debtor and Warren in the Circuit Court for Madison County alleging, among other things,  violations of the Virginia Consumer Protection Act and the Virginia Solicitation of Contributions laws against the Debtor (the "**State Court Litigation**"). Specifically, the Commonwealth alleges in its complaint that the Debtor misrepresented, *inter alia*:  (a) the skills and abilities of the dogs, (b) the testing and training of the dogs, (c) the

assistance that would be provided to the Recipients and other services that were included in the Fee, (d) how consumers could pay for the dog, and (e) why refunds were not permitted.

63.     The State Court Litigation is still ongoing, and on July 31, 2020, the Bankruptcy Court entered an order [Docket No. 43] granting relief from the automatic stay to the Commonwealth to continue the State Court Litigation.

64.     Not surprisingly, the State Court Litigation precipitated even more negative publicity for the Debtor.  It was widely covered by local and regional publications, as well as national publications, including Newsweek[11] and People[12] magazines.

65.     Notwithstanding the negative publicity and the pending State Court Litigation, the Debtor continued with business as usual.  It solicited new families for service dog placement, awarded "grants", accepted donations, encouraged fundraising efforts, and committed to placing service dogs as late as the spring of 2020, within weeks of the Petition Date.

E.     **Significant Pre-Petition Transfers**

66.     As listed on the Debtor's Statement of Financial Affairs [Docket No.19] (the "**SOFA**"), the Debtor had gross revenue of $1,300,000 in 2018, $980,000 in 2019, and $219,000 in 2020 through the Petition Date.  Despite this apparently significant income, the Debtor had virtually no assets as of the Petition Date.

67.     In the year preceding the Petition Date, the Debtor made significant, valuable transfers to the Related Entity Defendants and others, which basically stripped the Debtor of all its assets.

---

[11] https://www.newsweek.com/virginia-claims-company-gave-clients-untrained-puppies-instead-service-dogs-917910.

[12] https://people.com/pets/lawsuit-service-dogs-warren-retrievers-untrained-dogs/.

*(1) Vehicles and Trailers*

68.     Based on its second half 2019 Personal Property Tax Bill from the Treasurer of Madison County, Virginia (due December 5, 2019), the Debtor owned 12 vehicles and trailers, with an aggregate assessed value of $283,715, as follows:

| *Vehicle Year and Model* | *2019 Assessed Value* |
|---|---|
| 2017 Dodge Ram ProMaster Commercial Cargo Van | $22,000.00 |
| 2016 Chevrolet Express | $16,475.00 |
| 2017 Chevrolet Silvera (*sic.*) | $27,425.00 |
| 2017 Lark (*sic.*) | $2,001.00 |
| 2018 GMC Sierra | $52,600.00 |
| 2017 Jackson Creek Enclosed Trailer | $26,007.00 |
| 2013 Toyota Highlander | $12,975.00 |
| 2015 Chevrolet Suburban | $32,125.00 |
| 2017 Jackson Creek EA 7 | $21,672.00 |
| 2017 Buick Enclave | $24,050.00 |
| 2017 Chevrolet Equinox | $21,550.00 |
| 2004 Subaru Outback | $2,835.00 |

69.     In June 2018, the Debtor outfitted the 2017 Dodge Ram ProMaster Cargo Van with custom features for the transport of up to ten dogs in individual kennels, including insulation, sloping floors that automatically drain, a hot water heater, 20 gallon fresh water tank with pressure pump, storage cabinets, and a separate air conditioning and heating system for the rear cargo area.  The cost of these custom upgrades was $12,300.

70.     The Debtor also customized the two 2017 Jackson Creek trailers for the transport and/or display of dogs.  One of the trailers had 20 cages installed, while the other had 14 animal compartments with a dog bathing tub for grooming.  The cost of the trailers, including the custom upgrades, was $32,108 and $26,998, respectively.  Both trailers were purchased in 2017.

71.     On its Schedule A, the Debtor stated that it had no assets, other than $73.58 in a Wells Fargo bank account.

72.     On Question 13 of the SOFA, the Debtor stated that these two trailers were transferred in May, 2020.  One of the trailers was sold to Cheri Campbell, a former employee, for $2,500, and the other trailer was sold to Karen Campbell for $5,000.  In addition, two other trailers were transferred: the 2017 Stark trailer was sold to Cheri Campbell on May 20, 2020 for $500 tax (assessed value $2,223) and the 2004 Outback travel trailer was sold to Joseph and Erin Cook on February 27, 2020 for $5,500 (tax assessed value $3,150).

73.     The transfer and/or location of the remaining eight vehicles is unknown at this time, other than that the Debtor has stated on its Schedule A, under the penalty of perjury, that, as of the Petition Date, it had no vehicles or trailers.  Upon information and belief, those vehicles were transferred to related parties[13], and Warren and Dudek are living in the motorhome while they search for a new farm in Florida.

*(2) Other Hard Assets*

74.     In addition to the above transfers of the vehicles and trailers, the Debtor transferred other hard assets prior to the Petition Date.  On May 8, 2020, the Debtor purportedly sold a van to Grammy Rose Dog Rescue and Sanctuary for $34,000.

75.     Upon information and belief, the Debtor owned certain dog equipment, including training aids such as leashes and collars, food and water bowls, dog beds, etc.  The Debtor did not list any of this equipment on its Schedule A, and the location of such equipment is unknown at this time.

76.     Upon information and belief, the Debtor owned certain office furniture and equipment, including desks, chairs, computers, telephones, and printers.  The Debtor did not list any of this furniture and equipment on its Schedule A, and the location of such equipment is

---

[13] The Debtor did not state on Question 13 of the SOFA what happened with these eight vehicles, although it appears that the vehicles were transferred during the applicable two-year time period required by Question 13.

unknown at this time.  Upon information and belief, the Debtor's computers, which contain important financial information, are stored in a trailer on the BF Property.

### *(3) Breeding Stock, Puppies, and Service Dogs*

77.     Upon information and belief, the Debtor owned numerous dogs prior to the Petition Date, including breeding stock, puppies in the puppy raising program, and dogs in training.  The Debtor has not listed any dogs on its Schedule A.

78.     Upon information and belief, the Debtor held a "bonding event" on April 9, 2020 (the "**Bonding Event**"). The Debtor invited Recipients who had paid for a service dog in full or in part to come to the Bonding Event to pick up their service dog.  Some parties were not able to or declined to attend the Bonding Event.

79.     Upon information and belief, the Debtor also invited other parties to attend the Bonding Event to buy any dogs not selected by the Recipients.  The Debtor sold these dogs at negotiated prices far less than the $25,000 price paid by the Recipients.  Upon information and belief, the Debtor also gave away certain dogs.

80.     Upon information and belief, at the conclusion of the Bonding Event, the Debtor had few, if any, dogs remaining in its possession.

### *(4) Monetary Transfers*

81.     The Debtor also made significant monetary transfers, mostly to insiders, in the year proceeding the Petition Date.

### (a)  Transfers to Bordeaux Farms

82.     Upon information and belief, Bordeaux Farms did not have any business income other than the rent it received from SDWR pursuant to the SDWR Lease.  While Bordeaux Farms and the Debtor maintained separate bank accounts, the Debtor made frequent transfers from its

bank account to that of Bordeaux Farms.  During the one year period prior to the Petition Date, the Debtor made transfers from its bank accounts to Bordeaux Farms in the amount of $37,550 (the "**BF Transfers**").  A copy of the BF Transfers is attached hereto as <u>Exhibit B</u>.  Upon information and belief, there is no documentary support for these transfers.

83.    In addition to these transfers, the Trustee has identified transfers in the aggregate amount of $111,275 made by the Debtor to Bordeaux Farms during 2017.  Upon information and belief, there is no documentary support for these transfers.

84.    Upon information and belief, the Debtor also made payments to Bordeaux Farms for no consideration to satisfy the Essex Bank Loan.

85.    In the year prior to the Petition Date, the Debtor also made payments directly to SF, presumably as part of the payments due to SF under the BF Plan.

86.    The aggregate amount of fraudulent transfers made by the Debtor to Bordeaux Farms during the applicable federal and Virginia look-back periods for fraudulent transfers (together, the "**Fraudulent Transfer Periods**") is unknown at this time, but the Trustee estimates that such payments are in excess of $1 million.

(b) <u>Transfers to Bordeaux Livestock</u>

87.    Upon information and belief, Bordeaux Livestock did not have sufficient business income to support its business operations.  The Debtor, at the direction of Warren, financially supported Bordeaux Livestock at all times during the relevant Fraudulent Transfer Periods.

88.    While Bordeaux Livestock and the Debtor maintained separate bank accounts, the Debtor made frequent transfers from its bank account to that of Bordeaux Livestock.  During the one-year period prior to the Petition Date**,** the Debtor made transfers from its bank accounts to Bordeaux Livestock in the amount of $122,288 (the "**BL Transfers**").  A copy of the BL Transfers

is attached hereto as <u>Exhibit C</u>. Upon information and belief, there is no documentary support for the BL Transfers.

89.     Upon information and belief, the Debtor also made significant transfers to BL during the Fraudulent Transfer Periods. The aggregate amount of fraudulent transfers made by the Debtor to Bordeaux Livestock during the Fraudulent Transfer Periods is unknown at this time, but the Trustee estimates that such payments are in excess of $500,000.

(c)   <u>Transfers to Marianne Warren</u>

90.     Upon information and belief, Marianne Warren ("**Marianne**"), Warren's mother gave money to the Debtor to cover liquidity shortfalls and provide needed operating cash. Upon information and belief, these transfers were not documented as loans but were instead donations to the Debtor.

91.     During the one year period prior to the Petition Date**,** the Debtor made transfers from its bank accounts to Marianne in the amount of $119,000 (the "**Marianne Transfers**"). A copy of the Marianne Transfers is attached hereto as <u>Exhibit D</u>.

92.     Upon information and belief, the Debtor also made significant transfers to Marianne during the Fraudulent Transfer Period. The aggregate amount of fraudulent transfers made by the Debtor to Marianne during the Fraudulent Transfer Period is unknown at this time, but the Trustee estimates that such payments are in excess of $500,000.

## F.     The Bankruptcy Filing

93.     Once Warren had stripped the Debtor of substantially all its assets, the Debtor filed a voluntary chapter 7 petition on May 29, 2020.

94.     As of the Petition Date, the Debtor's only remaining asset was $73.58, consisting of cash on hand. *See* Schedule A/B [Docket No. 19].

## COUNT I
### Declaratory Judgment for Corporate Veil Piercing Under Virginia Law
### (Warren)

95.     The Trustee repeats and re-alleges each and every allegation contained in paragraphs 1 through 94 above as if fully set forth herein .

96.     Warren is the alter ego of the Debtor:

a.     **Control**.  He has control of the Debtor.  He is the Debtor's PIC, as well as its President and Chairman of the Board of Directors.  By virtue of his positions with and as the Debtor's PIC, Warren had complete decision-making authority for the Debtor.

b.     **Fraudulent Scheme**.  Warren used the Debtor to perpetuate a fraud on the Recipients, by inducing the Recipients to fundraise approximately $25,000 for a service dog, representing the service dogs as highly trained and specifically matched to the Recipient, and then providing the Recipient with a service dog with little or no specific disability detection training and, in some cases, an unsuitable temperament and even no house manners.  By using the Debtor and its status as a 501(c)(3) charitable organization, Warren was able to persuade Recipients that he was a highly qualified dog trainer who had the Recipients' best interests in mind when selling the Recipient a service dog.  In reality, Warren had no interest in the Recipient's welfare.  He was concerned only about himself and his bottom-line profit.

c.     **Unity of Ownership/Identity**.  The Debtor and Warren have a unity of ownership and identity.  Warren is the founder, PIC, and public face of the

Debtor.  He appeared at events and in the media on behalf of the Debtor, interacted with vendors, employees, and Recipients as the decision-maker of the Debtor, and at all times controlled the activities of the Debtor.  For all intents and purposes, there is no separateness between the Debtor and Warren – they are one and the same.

d.   **<u>No Separation of Assets</u>**.  Warren treated the assets of the Debtor as his own.  He used the Debtor's vehicles and trailers for his personal travel and enjoyment.  He withdrew money from the Debtor's bank account for the payment of personal expenses and expenses related to Bordeaux Farms and Bordeaux Livestock, the other entities that Warren controlled.  Warren consistently used the assets of the Debtor for his own benefit and personal gain.

e.   **<u>Impact on Creditors</u>**.  Warren's actions had a tremendous impact on the creditors in this Bankruptcy Case, the vast majority of whom are Recipients who either never received a service dog or received a service dog that was not sufficiently trained or had an unsuitable temperament.  The Recipients often relied on the assistance of friends, families, and employer-matching funds in order to fundraise the price of the service dog and endured a very public embarrassment when the service dog was never provided or was unsuitable.  The Recipients placed their trust and faith in Warren, only to have Warren betray them through the Debtor.

f.   **<u>Lack of Remedies Available to Creditors</u>**.  At Warren's direction, the Debtor transferred all its assets prior to the Petition Date.  As set forth in

its Schedule A, the Debtor's only asset is $73. The creditors have almost

no remedies available to them, other than pursuing corporate veil piercing

theories against Warren and reverse corporate veil piercing theories

against the Related Entity Defendants.[14]

97.    Because of Warren's control of the Debtor, his use of the Debtor to perpetuate a

fraudulent scheme, the unity of ownership and identity between the Debtor and Warren, the

failure to separate the assets of the Debtor from those of Warren, the impact of Warren's actions

on the Debtor's innocent creditors, and the lack of remedies available to these creditors, the

Trustee requests that the Court enter a declaratory judgment piercing the corporate veil and

finding that Warren is the alter ego of the Debtor and that the Trustee is authorized to marshal

Warren's assets for the benefit of the Debtor's creditors.

### COUNT II
### Declaratory Judgment for Reverse Veil Piercing Under Virginia Law
### (Bordeaux Farms)

98.    The Trustee repeats and re-alleges each and every allegation contained in

paragraphs 1 through 97 above as if fully set forth herein.

99.    Warren is the alter ego of Bordeaux Farms:

a.    **Control**. Warren is the sole member and PIC of Bordeaux Farms. Upon

information and belief, Bordeaux Farms has no officers or directors and is

managed solely by Warren. Warren signed the SDWR Lease on behalf of

Bordeaux Farms and the Debtor. Warren authorized the chapter 11

---

[14] On November 22, 2020, five Recipients filed a lawsuit against Warren, Dudek, Marianne, Bordeaux Farms, and Charitable Occasion in the United States District Court for the Eastern District of Virginia (Alexandria Division) (*Borg et al. v. Warren, Jr. et al.*, Case No. 20-cv-01441), asserting RICO claims, common law conspiracy, breach of contract, unjust enrichment, common law fraud, violations of state consumer laws, and violations of state unfair competition laws. A judgment obtained in this lawsuit against Bordeaux Farms and/or Charitable Occasion would attach to the BF Property and the CO Property, respectively, and potentially limit any possibility of recovery to the creditors in the Bankruptcy Case.

bankruptcy filing for Bordeaux Farms.  Warren also authorized the BF
Property to be pledged as security for the repayment of a debt owed by the
Debtor to SF pursuant to the Settlement with SF, as memorialized in the BF
Plan.

b.     **Fraudulent Scheme**.  Warren used Bordeaux Farms and the BF Property to
perpetuate a fraud on the Recipients.  He used pictures of the idyllic farm
property on the Debtor's website to give the appearance that the service
dogs were raised and trained in a top-notch facility in the Virginia
countryside and to induce the Recipients to place their trust and faith in
Warren.

c.     **Unity of Ownership/Identity**.  As the sole member and PIC of Bordeaux
Farms, Warren is the public face of Bordeaux Farms and the BF Property.

d.     **No Separation of Assets**.  The sole asset of Bordeaux Farms is the BF
Property.  Warren treats the BF Property as his own.  He and Dudek live on
the BF Property and, prior to the Petition Date, ran the business operations
of the Debtor and Bordeaux Livestock from the BF Property.  Warren, as
the alter ego of the Debtor, also directed that the Debtor's operating
revenues be used to support Bordeaux Farms.  Warren directed the transfer
of funds from the Debtor's account to Bordeaux Farms in the aggregate
amount of $37,550 in the one-year period prior to the Petition Date to cover
Bordeaux Farms' expenses.  Upon information and belief, these payments
are separate and distinct from the SDWR Lease payments, which were
made directly to SF by the Debtor during this time period.  While Bordeaux

Farms maintained a separate bank account, Warren treated the funds in the Debtor's bank account as a common pool of available cash to be freely transferred to Bordeaux Farms as needed.

e.      **Impact on Creditors**.  Warren's representations through Bordeaux Farms had a tremendous impact on the Debtor's creditors, the vast majority of whom are Recipients who either never received a service dog or received a service dog that was not sufficiently trained or had an unsuitable temperament. The Recipients often relied on the assistance of friends, families, and employer matching funds in order to fundraise the price of the service dog and endured a very public embarrassment when the service dog was never provided or was unsuitable.  The Recipients placed their trust and faith in Warren, only to have Warren betray them through the representations of the Debtor and Bordeaux Farms.

f.      **Lack of Remedies Available to Creditors**.  At Warren's direction, the Debtor transferred all its assets prior to the Petition Date.  As set forth in its Schedule A, the Debtor's only asset is $73.  The creditors have almost no remedies available to them, other than pursuing corporate veil piercing theories against Warren and reverse corporate veil piercing theories against the Related Entity Defendants.

100.    Because of Warren's control of Bordeaux Farms, his use of Bordeaux Farms to perpetuate a fraudulent scheme, the unity of ownership/identity between Warren and Bordeaux Farms, the failure to separate the assets of Bordeaux Farms from those of the Debtor and Warren, the impact of Warren's actions, as agent for Bordeaux Farms, on the Debtor's innocent creditors,

and the lack of remedies available to these creditors, the Trustee requests that the Court enter a declaratory judgment reverse piercing the corporate veil and finding that Bordeaux Farms is the alter ego of Warren and that the Trustee is authorized to marshal the assets of Bordeaux Farms for the benefit of the Debtor's creditors, including but not limited to the BF Property.

### COUNT III
**Declaratory Judgment for Reverse Veil Piercing Under Virginia Law
(Charitable Occasion)**

101.    The Trustee repeats and re-alleges each and every allegation contained in paragraphs 1 through 100 above as if fully set forth herein.

102.    Warren is the alter ego of Charitable Occasion:

    a.    **Control**.  Warren is the sole member and PIC of Charitable Occasion. Upon information and belief, Charitable Occasion has no officers or directors and is managed solely by Warren.  Warren also authorized the CO Property to be pledged as security for the repayment of a debt owed by the Debtor to SF pursuant to the Settlement with SF, as memorialized in the BF Plan.

    b.    **Fraudulent Scheme**.  Warren used Charitable Occasion and the CO Property to perpetuate a fraud on the Recipients.  He used pictures of the idyllic farm property on the Debtor's website to give the appearance that the service dogs were raised and trained in a top-notch facility in the Virginia countryside and to induce the Recipients to place their trust and faith in Warren.

    c.    **Unity of Ownership/Identity**.  As the sole member and PIC of Charitable Occasion, Warren is the public face of Charitable Occasion and the CO

Property.

d.   **No Separation of Assets**.  The sole asset of Charitable Occasion is the CO Property.  It is adjacent to the BF Property.  Warren treats the CO Property as his own.  He and Dudek utilize it for the business operations of the Debtor and Bordeaux Livestock

e.   **Impact on Creditors**.   Warren's representations through Charitable Occasion had a tremendous impact on the Debtor's creditors, the vast majority of whom are Recipients who either never received a service dog or received a service dog that was not sufficiently trained or had an unsuitable temperament. The Recipients often relied on the assistance of friends, families, and employer matching funds in order to fundraise the price of the service dog and endured a very public embarrassment when the service dog was never provided or was unsuitable.  The Recipients placed their trust and faith in Warren, only to have Warren betray them through the representations of the Debtor and Charitable Occasion.

f.   **Lack of Remedies Available to Creditors**. At Warren's direction, the Debtor transferred all its assets prior to the Petition Date.  As set forth in its Schedule A, the Debtor's only asset is $73.  The creditors have almost no remedies available to them, other than pursuing corporate veil piercing theories against Warren and reverse corporate veil piercing theories against the Related Entity Defendants.

103.   Because of Warren's control of Charitable Occasion, his use of Charitable Occasion to perpetuate a fraudulent scheme, the unity of ownership/identity between Warren and

Charitable Occasion, the failure to separate the assets of Charitable Occasion s from those of the Debtor, Bordeaux Farms, and Warren, the impact of Warren's actions, as agent for Charitable Occasion, on the Debtor's innocent creditors, and the lack of remedies available to these creditors, the Trustee requests that the Court enter a declaratory judgment reverse piercing the corporate veil and finding that Charitable Occasion is the alter ego of Warren and that the Trustee is authorized to marshal the assets of Charitable Occasion for the benefit of the Debtor's creditors, including but not limited to the CO Property.

**COUNT IV**
**Declaratory Judgment Pursuant to 11 U.S.C. § 105(a)**
**For Substantive Consolidation of Warren and the Related Entity Defendants**
**(In the Alternative to Counts I – III)**

104.    The Trustee repeats and re-alleges each and every allegation contained in paragraphs 1 through 103 above as if fully set forth herein.

105.    Warren and the Related Entity Defendants should be substantively consolidated because they satisfy the following elements:

    a.    **Complete Domination**.  Warren had complete domination of the Debtor and the Related Entity Defendants and used that domination to harm third parties through his fraudulent service dog scheme.  The Debtor and the Related Entity Defendants are all owned and controlled by Warren.  Warren has control of the Debtor as its PIC, President, and Chairman of the Board of Directors.  Warren has control of the Related Entity Defendants because he is the sole member and has broad managerial authority for each of the Related Entity Defendants.

    b.    **Fraud that Harms a Third Party**.  Warren, acting by and through the Debtor and Related Entity Defendants, orchestrated a fraudulent scheme

that harmed innocent third parties by inducing Recipients to fund raise $25,000 for a service dog, only for that dog to be untrained, unsuitable, or never delivered at all. Recipients, desperate for a solution, were duped by Warren's apparent knowledge and empathy, and charmed by the lovely organic farm in the rolling hills of Virginia, owned by Bordeaux Farms and Charitable Occasion, where the dogs lived and trained.

c.   **Absence of Corporate Formalities**.  The Debtor ostensibly had a board of directors; however, their role was more ceremonial than substantive. Warren made decisions on behalf of the Debtor, and, upon information and belief, would on occasion inform the board of directors of the decisions he had made.  The Debtor had one officer beside Warren – Dudek, Warren's spouse, who himself was under Warren's control.  Upon information and belief, the Related Entity Defendants had no officers or directors and were completely controlled by Warren.  They did not maintain separate corporate records or formalities.

d.   **Inadequate Capitalization**.  While the Debtor appears to have generated substantial operating revenues which should have been sufficient to support its operations, the Debtor clearly did not have adequate capitalization to support the financial obligations of the Related Entity Defendants.

e.   **Funds Used for Personal Purposes**.  Warren treated the Debtor's bank account and assets as a slush fund for his personal expenses and hobbies, as well as for the expenses of the Related Entity Defendants.  Warren directed the Debtor to pay above-market rent to Bordeaux Farms, at the same time

that the Debtor was paying for permanent improvements to Bordeaux Farms, such as for sheds and outbuildings on the BF Property. Warren lived on the BF Property and CO Property rent free and used the Debtor's vehicles, trailers, and motorhomes for his personal travel and vacations.

f.  **Overlap in Management and Ownership**. The Debtor and Related Entity Defendants have the same management and ownership – Warren. Warren is the Debtor's PIC, as well as its President and Chairman of the Board of Directors. Warren is the sole member of the Related Entity Defendants and has broad managerial authority for each of the Related Entity Defendants.

g.  **Transactions Not at Arm's Length**. The Debtor and the Entity Defendants did not deal with one another at arm's length. Warren made all the decisions on behalf of, and between, the entities. At Warren's direction, the Debtor transferred funds to Bordeaux Farms on numerous occasions, often within the course of a month. The amounts varied from month to month, and, upon information and belief, there is no documentation supporting these transfers. While the Debtor and Bordeaux Farms executed the SDWR Lease, the Debtor never transferred the contractual rate of monthly rent to Bordeaux Farms in one payment. Instead, it appears that the Debtor transferred funds to Bordeaux Farms on an "as needed basis," often in aggregate amounts during a one-month period far in excess of the stated monthly rent.

h.  **Payment or Guaranty of Debts of the Debtor by the Related Entity Defendants**. Warren directed that Bordeaux Farms and Charitable

Occasion file for bankruptcy and, through the bankruptcy, used the assets of Bordeaux Farms and Charitable Occasion (the BF Property and the CO Property) to secure the payment of a debt allegedly owed by the Debtor to SF.

i.   **Comingling of Funds**.   The Debtor, Warren and the Related Entity Defendants comingled their financial affairs so much that it is difficult to separate them.  The Debtor and Bordeaux Farms maintained separate bank accounts.   Upon information and belief, Charitable Occasion did not maintain a bank account but paid its expenses (such as real estate taxes and insurance) through Bordeaux Farms and/or the Debtor.   Warren treated the Debtor's bank accounts as a slush fund for his personal expenses and those of the Related Entity defendants.   He directed the transfer of funds from the Debtor's account to his personal account and the accounts of Bordeaux Livestock and Bordeaux Farms at will, presumably to meet payment shortfalls.  Upon information and belief, these transfers were not documented.

j.   **Inability to Separate Assets and Liabilities**.   Warren authorized and directed significant improvements to the BF Property, including but not limited to extensive renovations to the house and other dwelling units on the BF Property, as well as the construction of state-of-the-art kennels, a show-quality horse stable, and numerous outbuildings.  Warren paid for these improvements with funds donated to the Debtor, as the Debtor was the only party generating significant revenue.  The payment by the Debtor

for these permanent fixtures makes it impossible to separate the assets of the Debtor from those of the Related Entity Defendants. Upon information and belief, at Warren's direction, the Debtor transferred cash and other assets to the Related Entity Defendants which are not easily identified on the Debtor's bank records and thus cannot be separated.

k.    **No Prejudice to the Creditors of Warren and the Related Entities**. On the Schedules filed with their respective Chapter 11 bankruptcy petitions, the Related Entity Defendants identified only one creditor. As a result of the Settlement, SF is now a secured creditor with a lien against the BF Property and the CO Property. As such, SF will be paid in full upon the sale of the BF Property and the CO Property. Upon information and belief, the Related Entity Defendants do not have any general unsecured creditors, whose rights would be prejudiced by substantive consolidation. Upon information and belief, Warren has few creditors distinct from those of the Debtor, because Warren relied on the Debtor for the payment of his personal expenses, such as vehicles, insurance, mortgage payments, and utility payments. Warren's largest creditors – namely, the Commonwealth of Virginia and the Recipients – overlap with the Debtor and thus would not be prejudiced by substantive consolidation.

l.    **Benefit to the Debtor's Creditors**. At Warren's direction, the Debtor transferred all its assets prior to the Petition Date. As set forth in its Schedule A, the Debtor's only asset is $73. The BF Property is currently under contract, with a list price of $1.499 million. The BF Property has no

secured debt, other than the lien of SF pursuant to the Settlement
Agreement. It would be unfair to the Debtor's creditors to treat Warren
and the Related Entity Defendants separately from the Debtor. Warren
directed the Debtor to support financially his lifestyle and the operations
of the Related Entity Defendants. Now that the Debtor is insolvent, with
Warren having disbursed all the Debtor's assets outside of the reach of its
creditors, it would be unfair to allow Warren to retain for his sole benefit
valuable assets held in the name of the Related Entity Defendants

106.     Substantive consolidation of the Debtor, Warren, and Related Entity Defendants
is appropriate because (a) the Debtor, Warren and the Related Entity Defendants have
intermingled their financial affairs to the point that it is difficult to separate them and it is unfair
to creditors to treat them separately and (b) the creditors of Warren and the Related Entity
Defendants will not be prejudiced by substantive consolidation, whereas the creditors of the
Debtor will be greatly prejudiced if substantive consolidation does not occur.

107.     By reason of the foregoing, the Trustee requests that the Court enter a declaratory
judgment substantively consolidating the Debtor, Warren, and the Related Entity Defendants and
all of their assets, including but not limited to the BF Property and the CO Property.

### COUNT V
**Declaratory Judgment Pursuant to 11 U.S.C. § 105(a)
To Deem Bordeaux Farms a Constructive Trust**

108.     The Trustee repeats and re-alleges each and every allegation contained in
paragraphs 1 through 107 above as if fully set forth herein..

109.     Bordeaux Farms was established by Warren as a constructive trust to hold the BF
Property for the benefit of Warren.

110.    Warren purchased to BF Property on November 4, 2011.  Contemporaneously with the purchase, Warren transferred the BF Property to Bordeaux Farms by Deed of Contribution, which was dated on November 4, 2011.  By transferring the BF Property to Bordeaux Farms, Warren sought to keep the BF Property beyond the reach of his or the Debtor's creditors and to use Bordeaux Farms as a constructive trust for his benefit.

111.    Warren purchased the BF Property with the intention that the BF Property would serve as the base of operations for the Debtor.

112.    Warren knew at the time he purchased the BF Property that it would require significant permanent improvements to serve as the base of operations for the Debtor, including but not limited to the construction of permanent kennels, suitable office space, and storage space.

113.    Warren knew at the time he purchased the BF Property that it would require significant renovations to the house so that he and Dudek would be comfortable living there.

114.    Warren knew at the time he purchased the BF Property that he had no income other than the financial revenues generated by the Debtor, which would be necessary (a) to repay the Essex Bank Loan, (b) to pay taxes and insurance and other regular property expenses on the BF Property, (c) to pay for general upkeep on the BF Property, such as grounds maintenance, storm damage, and maintenance of access ways, and (d) to make necessary improvements to the BF Property for the renovations to the residence and the construction of the kennels and other necessary permanent improvements.

115.    Warren knew at the time he purchased the BF Property that while financial revenues generated by the Debtor at that time were adequate to support the BF Property, there was no guarantee that revenues would continue at the current level or increase.

116.    Warren knew at the time he purchased the BF Property that the business of training

- 38 -

and placing service dogs necessarily entailed significant potential liability exposure, if a service dog became aggressive towards friends or family or missed an alert, which resulted in serious harm to the Recipient.

117.    Warren knew at the time he purchased the BF Property that the Debtor could not hold title to the BF Property without potentially jeopardizing the Debtor's status as a 501(c)(3) tax-exempt entity, particularly given that Warren also intended to use the BF Property for the operation on Bordeaux Livestock, an allegedly profit-making venture.

118.    Warren recognized at the time he purchased the BF Property that establishing Bordeaux Farms as a single-asset, special-purpose entity to hold title to the BF Property was advisable to protect the BF Property from the reach of the Debtor's creditors and to  protect the Debtor's 501(c)(3) tax-exempt status.

119.    For all of the foregoing reasons, with the express intent of shielding his individual interest in the BF Property from creditors and potential liability exposure and creating a constructive trust for his sole benefit, Warren established Bordeaux Farms to hold title to the BF Property and transferred ownership of the BF Property to Bordeaux Farms by Deed of Contribution contemporaneously with the closing on the BF Property.

120.    Warren is the mastermind of a fraudulent scheme to sell allegedly highly-trained service dogs to desperate families at an exorbitant price.  The Debtor was the conduit for this scheme  by collecting charitable donations from the Recipients, identifying puppies to train as service dogs, training the service dogs, and eventually placing service dogs with Recipients.  Often, the dogs did not have a suitable temperament or lacked sufficient training to perform its intended use as a service dog.

121.    When the Debtor received money from the Recipients, Warren would direct the

Debtor to use those funds from the Recipients to support Warren's lifestyle and the Related Entity Defendants. The Debtor paid rent to Bordeaux Farms at above-market rates for kennel and office space. The Debtor also paid SF directly pursuant to the BF Plan.

122.    In addition to the rent payments and SF payments, the Debtor paid for significant permanent capital improvements to the BF Property, including but not limited to renovations to the house and the construction of stables, kennels, storage buildings and outbuildings, from donations made by Recipients in order to receive a service dog. Neither Warren nor Bordeaux Farms ever repaid for the cost of these improvements.

123.    As of the Petition Date, the Debtor had no assets other than $73. The Debtor has no assets from which to make a meaningful distribution to creditors, unless it can access funds from the sale of the BF Property.

124.    The improvements paid for by the Debtor to the BF Property are in large part the reason why the BF Property has more than doubled in value. Warren purchased the BF Property for $650,000 in November 2011 and now has it under contract with a list price of $1.499 million in December 2020.

125.    Warren would be unjustly enriched at the expense of creditors if he were allowed to retain ownership of Bordeaux Farms and the BF Property and reap the rewards of all the improvements made to the BF Property by the Debtor, through and as a direct result of the donations of the Recipients, over 100 of whom are now creditors in this Bankruptcy Case.

126.    By reason of the foregoing Bordeaux Farms should be deemed a constructive trust established for the benefit of Warren.

<u>COUNT VI</u>
**Avoidance and Recovery of Avoidable Transfer
as a Fraudulent Transfer Under 11 U.S.C. § 548(e)(1)
(Bordeaux Farms)**

127.    The Trustee repeats and re-alleges each and every allegation contained in paragraphs 1 through 126 above as if fully set forth herein.

128.    Warren transferred the BF Property to Bordeaux Farms on November 4, 2011, by Deed of Contribution.

129.    Bordeaux Farms is a constructive trust established for the benefit of Warren.

130.    The constructive trust established by Bordeaux Farms is similar to a self-settled trust, in that the same person (Warren) was the settlor of the trust and the beneficiary

131.    Warren is the alter ego of the Debtor.

132.    Warren is the beneficiary of the constructive trust.

133.    Warren transferred the BF Property to Bordeaux Farms with the intention of shielding the BF Property from attachment by creditors and to preserve the BF Property as an asset for his sole benefit.

134.    Upon information and belief, Warren has made clear his intention to sell the BF Property and to use those funds to purchase another farm in Florida, where there is no homestead exemption, so that he can start a new service dogs business or charity.

135.    Section 548(e)(1) of the Bankruptcy Code authorizes avoidance of a self-settled trust or similar device within ten years of the Petition Date.

136.    By reason of the foregoing, the transfer of the BF Property to Bordeaux Farms should be avoided and set aside as an avoidable fraudulent transfer pursuant to section 548(e)(1) of the Bankruptcy Code.

## COUNT VII
### Liability of the Defendants Under 11 U.S.C. § 550
### (Against Bordeaux Farms)

137.    The Trustee repeats and re-alleges each and every allegation contained in paragraphs 1 through 136 as if fully set forth herein.

138.    The Trustee is entitled to avoid the avoidable transfer of the BF Property to Bordeaux Farms (the "**Avoidable Transfer**") pursuant to section 548(e)1 of the Bankruptcy Code.

139.    Bordeaux Farms is the initial, immediate, and/or mediate transferee of the Avoidable Transfer.

140.    Warren is the alter ego of the Debtor.

141.    The Trustee is entitled to recover for the Estate the proceeds or value of the Avoidable Transfer pursuant to section 550 of the Bankruptcy Code.

142.    The Trustee is entitled to an order and judgment providing that the proceeds or value of the Avoidable Transfer is recovered for the benefit of the Estate pursuant to section 550 of the Bankruptcy Code.

## COUNT VIII
### Preservation of Property Under 11 U.S.C. §551
### (Against Bordeaux Farms)

143.    The Trustee repeats and re-alleges each and every allegation contained in paragraphs 1 through 142 as if fully set forth herein.

144.    The Avoidable Transfer is avoidable pursuant to section 548(e)(1) of the Bankruptcy Code.

145.    The Avoidable Transfer constitutes an interest of the Debtor in property and/or property of the estate.

146.    The Avoidable Transfer, or value thereof, should be preserved for the benefit of the Debtor's Estate pursuant to section 551 of the Bankruptcy Code.

## COUNT IX
### Injunctive Relief
### (Against Warren and Bordeaux Farms)

147.    The Trustee repeats and re-alleges each and every allegation contained in paragraphs 1 through 146 as if fully set forth herein.

148.    Warren and Bordeaux Farms should be enjoined from selling the BF Property, or, in the alternative, if the pending sale is to a third party purchaser for fair market value, be required to place the net proceeds of sale, after payment of the secured lien of SF and other usual and customary costs of sale, in escrow pending resolution of the disputes between the Trustee, Warren, and the Related Entity Defendants.

149.    Warren is the alter ego of the Debtor.

150.    Bordeaux Farms is the alter ego of Warren.

151.    Warren and Bordeaux Farms would not have been able to purchase, maintain, and make improvements to the BF Property without the use of the Debtor's funds.

152.    Warren dissipated all of the Debtor's assets, except for $73, prior to the Petition Date.

153.    The creditors in this Bankruptcy Case, the vast majority of whom are Recipients who raised funds for but never received a service dog, have no chance for a meaningful recovery in the Bankruptcy Case if Bordeaux Farms, acting through Warren, its agent and beneficiary, is allowed to sell the BF Property and control the proceeds of sale.

154.    In the event that Bordeaux Farms, acting through Warren, its agent and beneficiary, is allowed to sell the BF Property and control the proceeds of sale, the creditors in this Bankruptcy

Case would suffer irreparable harm.

155.     The impact to the creditors and the Trustee would be devastating and wide-ranging. The Debtor's sole asset, as listed on its Schedule A and verified under penalty of perjury by Warren, is $73.  If the BF Property is sold and the proceeds of sale not placed in escrow pending resolution of the dispute between the Trustee, Warren, and the Related Entity Defendants, the Trustee will likely have no choice but to declare the Bankruptcy Case a no asset case.  Creditors will receive nothing, even though they were the innocent victims of Warren's fraudulent scheme, and Warren will walk away with more than $1 million after payment of the secured lien of SF and costs of sale.

156.     An award of monetary damages could not serve an effective remedy for the harm that would be suffered by the creditors in the event that Warren and Bordeaux Farms are permitted to sell the BF Property and retain the proceeds of sale.  Warren would likely transfer the proceeds of sale beyond the Trustee's reach, perhaps by purchasing a new farm in Florida, filing for personal bankruptcy, and taking advantage of Florida's unlimited homestead exemption.  The Trustee would have no assurance that a money judgment against Warren and/or Bordeaux Farms would ever be paid, unless the proceeds of sale from the BF Property are placed in escrow.

157.     By reason of the foregoing, the Trustee requests that this Court grant injunctive relief and enjoin Warren and Bordeaux Farms from selling the BF Property, or, in the alternative, if the pending sale is to a third party purchaser for fair market value, requiring that the net proceeds of sale, after payment of the secured lien of SF and other usual and customary costs of sale, be placed in escrow pending resolution of the disputes between the Trustee, Warren, and the Related Entity Defendants.

## COUNT X
### Injunctive Relief
### (Against Warren and Charitable Occasion)

158.    The Trustee repeats and re-alleges each and every allegation contained in paragraphs 1 through 157 as if fully set forth herein.

159.    Warren and Charitable Occasion should be enjoined from selling the CO Property, or, in the alternative, if a third party purchaser desires to purchase the CO Property for fair market value, be required to place the net proceeds of sale, after payment of the secured lien of SF and other usual and customary costs of sale, in escrow pending resolution of the disputes between the Trustee, Warren, and the Related Entity Defendants.

160.    Warren is the alter ego of the Debtor.

161.    Charitable Occasion is the alter ego of Warren.

162.    Warren and Charitable Occasion would not have been able to purchase, maintain, and make improvements to the CO Property without the use of the Debtor's funds.

163.    Warren dissipated all of the Debtor's assets, except for $73, prior to the Petition Date.

164.    The creditors in this Bankruptcy Case, the vast majority of whom are Recipients who raised funds for but never received a service dog, have no chance for a meaningful recovery in the Bankruptcy Case if Charitable Occasion, acting through Warren, its agent and beneficiary, is allowed to sell the CO Property and control the proceeds of sale.

165.    In the event that Charitable Occasion, acting through Warren, its agent and beneficiary, is allowed to sell the CO Property and control the proceeds of sale, the creditors in this Bankruptcy Case would suffer irreparable harm.

166.    The impact to the creditors and the Trustee would be devastating and wide-ranging.

The Debtor's sole asset, as listed on its Schedule A and verified under penalty of perjury by Warren, is $73.  If the CO Property is sold and the proceeds of sale not placed in escrow pending resolution of the dispute between the Trustee, Warren, and the Related Entity Defendants, the Trustee will likely have no choice but to declare the Bankruptcy Case a no asset case.  Creditors will receive nothing, even though they were the innocent victims of Warren's fraudulent scheme, and Warren will walk away with a handsome sum from the sale of the CO Property, even after payment of the secured lien of SF and costs of sale.

167.    An award of monetary damages could not serve an effective remedy for the harm that would be suffered by the creditors in the event that Warren and Charitable Occasion are permitted to sell the CO Property and retain the proceeds of sale.  Warren would likely transfer the proceeds of sale beyond the Trustee's reach, perhaps by purchasing a new farm in Florida, filing for personal bankruptcy, and taking advantage of Florida's unlimited homestead exemption.  The Trustee would have no assurance that a money judgment against Warren and/or Charitable Occasion would ever be paid, unless the proceeds of sale from the CO Property are placed in escrow.

168.    By reason of the foregoing, the Trustee requests that this Court grant injunctive relief and enjoin Warren and Charitable Occasion from selling the CO Property, or, in the alternative, if a third party purchaser desires to purchase the CO Property for fair market value, requiring that the net proceeds of sale, after payment of the secured lien of SF and other usual and customary costs of sale, be placed in escrow pending resolution of the disputes between the Trustee, Warren, and the Related Entity Defendants.

## **RELIEF REQUESTED**

The Trustee respectfully requests that this Court enter an order and judgment:

(a)      With respect to Count I, entering a declaratory judgment piercing the corporate veil and finding that Warren is the alter ego of the Debtor and that the Trustee is authorized to marshal Warren's assets for the benefit of the Debtor's creditors;

(b)      With respect to Count II, entering a declaratory judgment reverse piercing the corporate veil and finding that Bordeaux Farms is the alter ego of Warren and that the Trustee is authorized to marshal Bordeaux Farms' assets for the benefit of the Debtor's creditors, including but not limited to the BF Property;

(c)      With respect to Count III, entering a declaratory judgment reverse piercing the corporate veil and finding that Charitable Occasion is the alter ego of Warren and that the Trustee is authorized to marshal Charitable Occasion's assets for the benefit of the Debtor's creditors, including but not limited to the CO Property;

(d)      With respect to Count IV, and in the alternative to Counts I-III, entering a declaratory judgment substantively consolidating the Debtor, Warren, and the Related Entity Defendants;

(e)      With respect to Count V, declaring that Bordeaux Farms is a constructive trust established for the benefit of Warren;

(f)      With respect to Count VI, avoiding and setting aside the transfer of the BF Property to Bordeaux Farms as an avoidable fraudulent transfer pursuant to Section 548(e)(1) of the Bankruptcy Code;

(g)      With respect to Count VII, directing Bordeaux Farms to transfer the BF Property to the Trustee to be administered for the benefit of the Bankruptcy Estate or to pay to the Trustee

an amount to be determined at trial that is not less than the value of the Avoidable Transfer of at least **One Million Five Hundred Thousand and No/100 Dollars ($1,500,000.00)**, which constitutes the value of the Debtor's property transferred through the Avoidable Transfers made to Bordeaux Farms pursuant to sections 548(e)(1) and 550 of the Bankruptcy Code;

(h)    With respect to Count VIII, preserving the Avoidable Transfer, or the value thereof, for the benefit of the Debtor's Estate pursuant to section 551 of the Bankruptcy Code;

(i)    With respect to Count IX, awarding injunctive relief and enjoining Warren and Bordeaux Farms from selling the BF Property, or, in the alternative, if the pending sale is to a third party purchaser for fair market value, requiring that the net proceeds of sale, after payment of the secured lien of SF and other usual and customary costs of sale, be placed in escrow pending resolution of the disputes between the Trustee, Warren, and the Entity Defendants;

(j)    With respect to Count X, awarding injunctive relief and enjoining Warren and Charitable Occasion from selling the CO Property, or, in the alternative, if a third party purchaser desires to purchase the CO Property for fair market value, requiring that the net proceeds of sale, after payment of the secured lien of SF and other usual and customary costs of sale, be placed in escrow pending resolution of the disputes between the Trustee, Warren, and the Entity Defendants;

(k)    awarding pre-judgment interest at the maximum legal rate running from the date of the Trustee's first demand to return the Avoidable Transfer to the date of judgment with respect to this Complaint herein;

(l)    awarding the Trustee his costs and expenses incurred in connection with this Adversary Proceeding, including reasonable attorneys' fees;

(m)    awarding post-judgment interest at the maximum legal rate running from the date of the judgment until the date the judgment is paid in full, plus costs;

(n)    requiring the Defendants to pay forthwith the amount of the judgment; and

(o)    granting the Trustee such other and further relief as the Court deems just and proper.

## **CONCLUSION**

**WHEREFORE**, the Trustee requests that this Court (i) grant the Trustee the relief requested in this Complaint; and (ii) grant such other and further relief to the Trustee as this Court deems just and proper.

Dated:  December 30, 2020

/s/ Robert S. Westermann
Robert S. Westermann (VSB No. 43294)
Kristen E. Burgers (VSB No. 67997)
Brittany Falabella (VSB No. 80131)
HIRSCHLER FLEISCHER, P.C.
The Edgeworth Building
2100 East Cary Street
Post Office Box 500
Richmond, Virginia 23218-0500
Telephone:  804.771.9500
Facsimile:   804.644.0957
E-mail:      rwestermann@hirschlerlaw.com
             kburgers@hirschlerlaw.com
             bfallabella@hirschlerlaw.com

*Counsel for W. Stephen Scott,*
*Chapter 7 Trustee for the Bankruptcy*
*Estate of Service Dogs by Warren*
*Retrievers, Inc.*

# **<u>EXHIBIT A</u>**

# **BYLAWS**

## BYLAWS OF GUARDIAN ANGEL SERVICE DOGS, INC.
### (A Virginia Nonstock Corporation)

### ARTICLE I
### Name and Location

The name of the corporation is **Guardian Angel Service Dogs, Inc.** (the "Corporation"). The principal office of the Corporation shall initially be located at 15216 Rockford Road, Montpelier, Virginia 24192, but the meetings of the Directors may be held at such places as may be designated by the Board of Directors.

### ARTICLE II
### Purpose, Net Earnings Restriction, Distribution Upon Dissolution

2.1      Purpose.  The Corporation is organized exclusively for educational purposes and, to the extent that such educational purposes are coupled with a charitable component, for charitable purposes, within the meaning of Section 501(c)(3) of the Internal Revenue Code or the corresponding section of any future federal tax code. In furtherance thereof, the Corporation is organized to provide educational training (including without limitation classroom training, personalized individual training and public access training)  to individuals and groups about the benefits of having a service dog and the types of assistance that service dogs may provide to persons with (a) health issues, including without limitation, diabetes, and (b) disabilities that are included under the Americans with Disabilities Act and related state and local accessibility statutes, laws and regulations.  Further, the Corporation will assist such persons by offsetting the costs for the purchase and training of a service dog for individuals with health issues or disabilities who apply to the Corporation for assistance and who would benefit from having a canine companion in their lives to enhance their quality of life and to remove barriers that prevent these individuals from living their lives to the fullest extent possible.

2.2      Net Earnings Restriction.  No part of the net earnings of the Corporation shall inure to the benefit of, or be distributable to its Directors, Officers or other private persons, except that the Corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth in Section 2.1 above. No substantial part of the activities of the Corporation shall be the carrying on of propaganda or otherwise attempting to influence legislation, and the Corporation shall not participate in, or intervene in (including the publishing or distribution of statements) any political campaign on behalf of or in opposition to any candidate for public office. Notwithstanding any other provision of these articles, the Corporation shall not carry on any other activities not permitted to be carried on (a) by a corporation exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code or the corresponding section of any future federal tax code, or (b) by a corporation, contributions to which are deductible under Section 170(c)(2) of the Internal Revenue Code or the corresponding section of any future federal tax code.

1

2.3      Distribution Upon Dissolution.  Upon the dissolution of the Corporation, assets shall be distributed for one or more exempt purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code or the corresponding section of any future federal tax code, or shall be distributed to the federal government, or to a state or local government, for a public purpose. Any such assets not so disposed of shall be disposed of by a court of competent jurisdiction in the City or County in which the principal office of the Corporation is then located, exclusively for such purposes or to such organization or organizations, as said court shall determine, which are organized and operated exclusively for such purposes.

## ARTICLE III

### No Members

The Corporation will not have Members.

## ARTICLE IV
### Board of Directors: Appointment/Term of Office

Section 4.1.  Number.  The affairs of the Corporation shall be managed by a Board of not less than three (3) or more than fifteen (15) Directors.

Section 4.2  Initial Directors.  The five (5) initial Directors of the Corporation are set forth in the Articles of Incorporation. The initial Directors shall serve until the next election of Directors.

Section 4.3.  Nominations.  Nominations for election to the Board of Directors shall be made by a Nominating Committee consisting of at least two (2) Initial Directors and, if there are other Directors, at least one (1) other Director. Nominations may also be made from the floor at the annual meeting of the Directors. The Nominating Committee shall be appointed by the Board of Directors prior to each annual meeting of the Board of Directors, to serve from the close of such annual meeting until the close of the next annual meeting and such appointment shall be announced at each annual meeting. The Nominating Committee shall make as many nominations for election to the Board of Directors as it shall in its discretion determine, but no less than the number of vacancies that are to be filled and no more than the maximum number set forth in Section 4.1 above.

Section 4.4.  Appointment of Directors.  At the first annual meeting of the Corporation, the Initial Directors shall appoint themselves and as few as none and as many as ten (10) additional Directors to serve as Directors of the Corporation. Such initial appointments to the Board of Directors shall be for terms of one (1) to three (3) years in a manner whereby no more than one-third (1/3) of the Directors shall have terms that expire in the same year. After the initial staggered appointments of terms for less than three (3) years, a Director's term shall be for three (3) years. Each Director shall be eligible to serve for a second three (3) year term and, after a two (2) year absence from the Board of Directors, may again be appointed as a Director. At

each annual meeting after the first annual meeting, the Directors shall appoint the Directors of the Corporation for the following year. Voting for such appointments may be accomplished by voice vote or, at the call of the President, by secret written ballot. A Director's term shall begin at the first meeting of the Board of Directors following the annual meeting of the Board of Directors.

Section 4.5.  Removal.  Any Director except Charles D. Warren, Jr. may be removed from the Board, with or without cause, by a two-thirds (2/3) majority vote of the Directors of the Corporation. Because of the involvement of Charles D. Warren, Jr. in the conceptual basis for the Corporation's existence, mission and purpose, he may only be removed as a Director by unanimous vote of all other Directors on the basis of a material and intentional breach of fiduciary duty or willful wrongful action. Absent removal on such basis and Section 4.4 above notwithstanding, Charles D. Warren, Jr. shall be entitled to be a Director of the Corporation. In the event of death, resignation or removal of a Director or vacancy for any other reason, such Director's successor shall be selected by the remaining Directors on the Board and such successor shall serve such Director's unexpired term.

Section 4.6. Compensation.  No Director shall receive compensation for any services rendered as a Director to the Corporation. However, any Director may be reimbursed for actual expenses incurred in the performance of a Director's duties and, notwithstanding the foregoing, the Corporation shall be authorized and empowered to pay reasonable compensation for other services rendered by its Directors and for services rendered by Officers and employees.

Section 4.7. Action Taken Without a Meeting.  The Directors shall have the right to take any action in the absence of a meeting, which they could take at a meeting, by obtaining the written approval of all Directors. Any action so approved shall have the same effect as though taken at a meeting of the Directors.

## ARTICLE V
## Meetings of Directors

Section 5.1. Meetings. Meetings of the Board of Directors shall be held as frequently and at such place and hour as may be fixed from time to time by resolution of the Board, but not less than quarterly. Annual meetings of the Board of Directors shall be held in conjunction with the annual meeting of the Corporation.

Section 5.2.  Special Meetings.  Special meetings of the Board of Directors shall be held when called by the President of the Corporation, or by any two Directors, after not less than three days notice to each Director.

Section 5.3.  Quorum.  A majority of the Directors shall constitute a quorum for the transaction of business. Every act or decision done or made by a majority of the Directors present at a meeting at which a quorum is present shall be regarded as an act of the Board of

Directors.

Section 5.4. Presiding Director. The Directors may elect a Chairperson among their number, who shall preside over meetings of the Board of Directors. The Directors may also elect a Vice Chairperson, who shall act in the place of the Chairperson if he or she is absent. In the absence of the election of a Chairperson or a Vice Chairperson, Charles D. Warren, Jr. shall preside over all meetings.

Section 5.5. Telephonic or Internet Meetings. The Directors may meet by telephone conference and/or other communication devices, provided that all Directors can hear and be heard; provided further, however, that all actions so approved shall subsequently be reduced to writing and signed by all Directors as to whether he or she voted for or against any such action, so that the Corporation's records may be properly maintained. Such writings in confirmation of actions may be in counterparts, all of which when combined shall constitute one original, and signatures transmitted by fax or scanned and electronically transmitted shall be deemed to be as valid as original signatures.

## ARTICLE VI
### Powers and Duties of the Board of Directors

Section 6.1. Powers.  The Board of Directors shall have the power to manage the affairs of the Corporation, including the following:

a)  exercise for the Corporation all powers, duties and authority vested in or delegated to the Corporation as set forth in the Bylaws or the Articles of Incorporation;

b)  take all necessary actions to seek exemption from taxation status under Section 501(c)(3) of the Internal Revenue Code or the corresponding section of any future federal tax code, and, if granted, to thereafter take all actions necessary to maintain such tax exempt status; and

b)  declare the office of a Director to be vacant in the event such Director shall be absent from three (3) consecutive regular meetings of the Board of Directors.

Section 6.2. Duties.  It shall be the duty of the Board of Directors to:

a)  cause to be kept a complete record of all its acts and corporate affairs and to present a statement thereof to be included in the Corporation's record book in furtherance of the powers set forth in Section 6.1 above;

b)  supervise all Officers, agents and employees of the Corporation, and to see that their duties are properly performed; and

c)  operate, manage and supervise the regular activities of the Corporation in furtherance of the Corporation's purposes as set forth herein and as set forth in the Articles of Incorporation of the Corporation.

4

## ARTICLE VII
### Executive Director and Staff

Section 7.1  The Board of Directors may appoint an Executive Director, who shall act as the Chief Operating Officer of the Corporation and who shall report directly to the President and who shall be under the control and supervision of the President.

Section 7.2  The Executive Director shall serve at the pleasure of the President and the Board of Directors as an employee at will under a contract or agreement providing for and setting forth reasonable compensation and performance expectations and standards, which contract shall be for such term as the President and the Board of Directors determine is appropriate and shall be renewable at the will and pleasure of the President and the Board of Directors.

Section 7.3  The President may, or the Board of Directors may, upon review and by two-thirds (2/3) vote of the Board of Directors, determine that the Executive Director is no longer performing his or her duties in a manner that meets the expectations of the President or of the Board of Directors and/or the needs of the Corporation, and the President may exercise his judgment or the Board of Directors may exercise its collective judgment in employing appropriate methods of remediation, including termination.

Section 7.4:  Duties of the Executive Director shall include but shall not be limited to:
a) design, develop and implement strategic plans for the Corporation in a cost-effective and time-efficient manner;
b) have responsibility for the Corporation's day-to-day operations, including managing committees and hiring and managing staff and developing business plans in collaboration with the Board of Directors for the future of the Corporation and its purposes;
c) oversee and develop fundraising activities, mentoring of volunteers and staff and development of the organizational culture of the corporation;
d) increase the profile of the Corporation; and
e) have other duties as may from time to time be prescribed and identified by the President or the Board of Directors.

## ARTICLE VIII
### Committees

The Corporation shall have the power to appoint such Committees as the Board of Directors deems necessary and appropriate in order to carry out the purposes of the Corporation.

# ARTICLE IX
## Officers and Their Duties

Section 9.1.  Enumeration of Officers. The Officers of the Corporation shall be a President (who shall also be a Director of the Corporation), a Secretary and a Chief Financial Officer and may include one or more Assistant Secretaries and Assistant Financial Officers, and such other offices as the Board of Directors may from time to time create.

Section 9.2. Election of Officers.  The election of Officers shall take place at the  annual meeting of the Board of Directors.

Section 9.3.  Term.  Except as provided for otherwise herein, the Officers of the Corporation shall hold office for two years unless an Officer shall sooner resign, be removed or otherwise be disqualified to serve. All Officers shall be eligible for re-election to the position held by him or her. In view of the involvement of Charles D. Warren, Jr. in the conceptual basis for the Corporation's existence, mission and purpose, the initial Directors have determined that Charles D. Warren, Jr. shall be elected as the President of the Corporation and shall serve as the President of the Corporation, and shall be removed as President only by unanimous vote of all other Directors on the basis of a material and intentional breach of fiduciary duty or willful wrongful action. Absent removal on such basis, Charles D. Warren, Jr. shall be entitled to be the President of the Corporation.

Section 9.4.  Special Appointments.  The Board of Directors may appoint such other Officers as the affairs of the Corporation may require, each of whom shall hold office for such period, have such authority and perform such duties as the Board of Directors may, from time to time, determine.

Section 9.5. Resignation and Removal. With the exception of the President, he Board of Directors may remove any Officer from office with or without cause by a majority vote of the Directors.  Any Officer may resign at any time by giving written notice to the Board of Directors at the Registered Office of the Corporation. Such resignation shall take effect on the date of receipt of such notice or at any later time specified therein.  The acceptance of such resignation shall not be necessary to make it effective. Upon the resignation or removal of an Officer, the Board of Directors may appoint a person to fill the office vacated by such resignation or removal until the next election of Officers.

Section 9.6. Vacancies.  A vacancy in any office may be filled in the manner prescribed for regular election.  The Officer elected to such vacancy shall serve for the remainder of the term of the replaced Officer, and shall thereafter be eligible for re-election to such office.

Section 9.7. Multiple Offices.  The same person may hold the offices of President, Secretary and Chief Financial Officer, and other persons may hold multiple offices, but no person shall simultaneously hold more than two (2) offices, except (a) during such time as there is only one (1) Director and (b) in the case of special offices created pursuant to Section 8.4

6

above.

Section 9.8. Duties.  The duties of the Officers are as follows:

a)  President. The President shall attend all meetings of the Board of Directors; shall see that orders and resolutions of the Board are carried out; and shall be authorized to sign documents on behalf of the Corporation as directed by the Board of Directors. Additionally, the President shall have all of the same powers and authority as the Executive Director of the Corporation, and the President and the Executive Director, who may act independently of each other, shall at all times act in the best interests of the Corporation and in furtherance of the purposes of the Corporation as set forth in the Articles of Incorporation and in these Bylaws.

b)  Secretary and Assistant Secretaries.  The Secretary shall record the votes and keep the minutes of all meetings and proceedings of the Board of Directors; serve notice of meetings of the Board of Directors; keep current records showing the Directors and Officers of the Corporation and their addresses and shall perform such other duties as may be required by the Board of Directors. Assistant Secretaries shall assist the Secretary in the performance of these duties as directed by the Secretary.

c)  Chief Financial Officer and Assistant Financial Officers. The Chief Financial Officer shall receive and deposit in appropriate bank accounts all monies of the Corporation and shall disburse such finds as directed by resolution of the Board of Directors; keep proper books of account; and shall prepare an annual budget and a statement of income and expenditures to be presented to the Board of Directors at its regular annual meeting and shall deliver a copy of each to the Directors. Additionally, the Chief Financial Officer shall be certain that all federal, state and local tax filings required to be filed are properly prepared and filed in a proper and timely manner. Assistant Financial Officers shall assist the Chief Financial Officer in the performance of these duties as directed by the Chief Financial Officer.

d)  The Secretary and the Chief Financial Officer, acting together, shall act in the place of the President when the President is unavailable or unable to perform the duties of President.

### ARTICLE X
### Books and Records

The books and records of the Corporation shall be available for inspection by any Director during reasonable business hours. The Articles of Incorporation and the Bylaws of the Corporation shall be available for inspection by any Director at the principal office of the Corporation, where copies may be purchased at a reasonable cost.

## ARTICLE XI
### Amendments, Conflicts

Section 11.1.  These Bylaws may be amended, at a regular or special meeting of the Directors or by written consent in lieu thereof, by a vote of a two-thirds (2/3) majority of a quorum of the Directors present in person, in writing or by electronic transmission.

Section 11.2.  In the case of any conflict between the Articles of Incorporation and these Bylaws, the Articles shall control.

## ARTICLE XII
### Proceedings of Meetings

Robert's Rules of Order shall govern the proceedings of all meetings.

## ARTICLE XIII
### Miscellaneous

The fiscal year of the Corporation shall be a calendar year and shall begin on the first day of January and end on the last day of December, except that the first fiscal year shall begin on the date of incorporation.


(Signatures Follow On Next Page)

8

Witness the following signatures (for purposes of these Bylaws, the Initial Directors agree that (1) these Bylaws may be signed in counterparts, all of which when combined shall constitute one document, and (2) that faxed signatures and electronically transmitted signatures shall be deemed to be original signatures):

_____          _____
Date                             Charles D. Warren, Jr., Initial Director


_____          _____
Date                             Karen Sue Kindred, Initial Director


_____          _____
Date                             Dr. Wendy R. Regal, Initial Director


_____          _____
Date                             Teresa A. Lizardi, Initial Director


_____          _____
Date                             Dr. Kara A. Kolster, Initial Director

**<u>EXHIBIT B</u>**

**BF TRANSFERS**

| <u>DATE</u> | <u>AMOUNT</u> |
|---|---|
| 5/31/2019 | $2,000.00 |
| 6/10/2019 | $5,600.00 |
| 6/12/2019 | $2,000.00 |
| 6/14/2019 | $2,000.00 |
| 6/21/2019 | $2,000.00 |
| 8/2/2019 | $600.00 |
| 8/9/2019 | $600.00 |
| 8/23/2019 | $1,000.00 |
| 8/30/2019 | $750.00 |
| 9/6/2019 | $1,000.00 |
| 9/18/2019 | $1,000.00 |
| 9/20/2019 | $1,000.00 |
| 10/8/2019 | $1,000.00 |
| 10/11/2019 | $2,000.00 |
| 10/18/2019 | $2,000.00 |
| 10/25/2019 | $1,000.00 |
| 11/4/2019 | $1,000.00 |
| 11/15/2019 | $1,000.00 |
| 11/22/2019 | $1,000.00 |
| 12/6/2019 | $1,000.00 |
| 12/13/2019 | $1,000.00 |
| 12/20/2019 | $1,000.00 |

| | |
|---|---|
| 1/7/2020 | $1,000.00 |
| 1/17/2020 | $1,000.00 |
| 1/24/2020 | $1,000.00 |
| 2/7/2020 | $1,000.00 |
| 3/13/2020 | $500.00 |
| 3/20/2020 | $500.00 |
| 3/27/2020 | $500.00 |
| 4/3/2020 | $500.00 |
| **TOTAL BF TRANSFERS** | **$37,550.00** |

## EXHIBIT C

### BL TRANSFERS

| DATE | AMOUNT |
|------|--------|
| 6/4/2019 | $2,000.00 |
| 6/17/2019 | $4,500.00 |
| 6/27/2019 | $1,200.00 |
| 7/2/2019 | $1,000.00 |
| 7/3/2019 | $600.00 |
| 7/3/2019 | $500.00 |
| 7/11/2019 | $1,500.00 |
| 7/18/2019 | $500.00 |
| 7/22/2019 | $1,200.00 |
| 7/29/2019 | $2,000.00 |
| 7/30/2019 | $2,000.00 |
| 8/2/2019 | $1,500.00 |
| 8/5/2019 | $1,100.00 |
| 8/9/2019 | $1,000.00 |
| 8/13/2019 | $1,700.00 |
| 8/16/2019 | $1,500.00 |
| 8/19/2019 | $1,200.00 |
| 8/20/2019 | $1,200.00 |
| 8/23/2019 | $1,500.00 |
| 9/3/2019 | $1,500.00 |
| 9/3/2019 | $500.00 |
| 9/6/2019 | $500.00 |
| 9/16/2019 | $2,500.00 |
| 9/18/2019 | $3,500.00 |
| 9/27/2019 | $500.00 |
| 10/1/2019 | $1,200.00 |

| | |
|---|---|
| 10/3/2019 | $1,500.00 |
| 10/7/2019 | $3,200.00 |
| 10/15/2019 | $3,000.00 |
| 10/16/2019 | $1,000.00 |
| 10/21/2019 | $1,500.00 |
| 10/30/2019 | $400.00 |
| 11/1/2019 | $1,800.00 |
| 11/4/2019 | $2,000.00 |
| 11/12/2019 | $3,000.00 |
| 11/18/2019 | $3,500.00 |
| 11/27/2019 | $1,000.00 |
| 12/2/2019 | $2,000.00 |
| 12/3/2019 | $500.00 |
| 12/4/2019 | $2,000.00 |
| 12/9/2019 | $1,000.00 |
| 12/16/2019 | $1,000.00 |
| 12/16/2019 | $2,400.00 |
| 12/17/2019 | $1,100.00 |
| 12/18/2019 | $600.00 |
| 12/19/2019 | $1,000.00 |
| 12/26/2019 | $1,000.00 |
| 12/30/2019 | $900.00 |
| 1/3/2020 | $2,200.00 |
| 1/6/2020 | $1,500.00 |
| 1/7/2020 | $1,000.00 |
| 1/10/2020 | $500.00 |
| 1/13/2020 | $2,500.00 |
| 1/21/2020 | $1,000.00 |
| 1/21/2020 | $750.00 |
| 1/22/2020 | $1,663.00 |
| 1/27/2020 | $900.00 |

| | |
|---|---|
| 1/28/2020 | $900.00 |
| 2/3/2020 | $1,500.00 |
| 2/3/2020 | $100.00 |
| 2/5/2020 | $3,000.00 |
| 2/7/2020 | $400.00 |
| 2/11/2020 | $1,000.00 |
| 2/13/2020 | $500.00 |
| 2/18/2020 | $500.00 |
| 2/20/2020 | $2,500.00 |
| 2/20/2020 | $100.00 |
| 2/21/2020 | $500.00 |
| 2/25/2020 | $1,500.00 |
| 2/26/2020 | $1,100.00 |
| 3/2/2020 | $1,500.00 |
| 3/9/2020 | $1,500.00 |
| 3/9/2020 | $600.00 |
| 3/10/2020 | $3,000.00 |
| 3/13/2020 | $2,000.00 |
| 3/13/2020 | $5,500.00 |
| 3/17/2020 | $500.00 |
| 3/20/2020 | $2,000.00 |
| 3/25/2020 | $3,775.00 |
| 4/1/2020 | $1,000.00 |
| 4/1/2020 | $2,000.00 |

**TOTAL BL TRANSFERS**             **$122,288.00**

## <u>EXHIBIT D</u>

**MARIANNE TRANSFERS**

| <u>DATE</u> | <u>AMOUNT</u> |
|------|--------|
| 11/20/2019 | $5,000.00 |
| 11/20/2019 | $50,000.00 |
| 12/24/2019 | $30,000.00 |
| 5/11/2020 | $34,000.00 |
| **TOTAL MARIANNE TRANSFERS** | **$119,000.00** |

13085242.3  045444.00001